**Miguel Concha ARAGON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–94–349 CR.**

Court of Appeals of Texas,
Beaumont.

Submitted July 19, 1995.

Decided Nov. 22, 1995.

John D. Reeves, Lufkin, for appellant.

Clyde M. Herrington, District Attorney, Lufkin, Art Bauereiss, Asst. District Attorney, Lufkin, for State.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

**OPINION**

WALKER, Chief Justice.

This is an appeal from a conviction for the felony offense of Unauthorized Use of a Motor Vehicle. Following its verdict, the jury assessed appellant's punishment at ten (10) years' confinement in the Texas Department of Criminal Justice, Institutional Division, and additionally fined appellant $8,000. Appellant raises two points of error on appeal, *viz:*

> Point of Error One: The evidence was insufficient to find the appellant competent to stand trial. Appellants (sic) motion for

instructed verdict during the competency hearing was improperly denied.

Point of Error Two: Appellant proved his affirmative defense of insanity and the judgment is against the great weight and preponderance of the evidence so as to be manifestly unjust.

Under his first point of error, appellant provides us with arguments, both legal and factual as to why the competency issue should have been decided in his favor. Appellant fails, however, to provide us with any constitutional, statutory, or case authority in support of said argument. This point of error would not normally be addressed because of the inadequacy of appellant's brief. *See Vuong v. State,* 830 S.W.2d 929, 940 (Tex.Crim.App.1992), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); TEX.R.APP.P. 74(f). Nevertheless, we will address point of error one in the interest of justice.

TEX.CODE CRIM.PROC.ANN. art. 46.02, sec. 1 (Vernon 1979) provides the following:

(a) A person is incompetent to stand trial if he does not have:

(1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or

(2) a rational as well as factual understanding of the proceedings against him.

(b) A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence.

■ Because an accused is presumed competent, a defendant must prove his incompetency by a preponderance of the evidence. *Manning v. State,* 730 S.W.2d 744, 748 (Tex.Crim.App.1987). We review the entire record of the competency hearing to determine whether the finding of competence is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Meraz v. State,* 785 S.W.2d 146, 155 (Tex.Crim.App.1990). In the instant proceeding, the parties selected a jury to hear the issue of competency. The actual competency trial began on October 6, 1994. From the record before us, it appears that the State was initially in agreement with the defense that appellant was indeed incompetent to stand trial. This is evident from the State's opening remarks to the jury, to-wit:

[The State]: Very briefly, your honor. [Defense Counsel] is correct, I don't take too much issue with anything he said regarding the defendant's current mental state.... All we're going to be doing here today is getting a jury verdict that he is not presently competent to stand trial.... So, I think that once you hear all of the evidence regarding not just his mental illness but also regarding the treatment that he at one point did receive, you will come to the conclusion that with further treatment he is likely to regain his competency to stand trial and I will ask you to answer that special issue in that fashion. Thank you.

■ The record reflect that the appellant called five witnesses in his behalf. The State called no witnesses. The first two witnesses were Lieutenant Ken Stewart, Jail Administrator for the Angelina County Jail, and Assistant Jail Administrator, Lieutenant Glenn Wideman. Both witnesses testified to a variety of instances of unusual behavior exhibited by appellant either from having personally witnessed said behavior, or from examination of incidents documented by jail staff. In describing attempts to communicate with appellant, Lt. Stewart testified to the following:

Q. [The State] Does he sometimes just blurt out or make inappropriate statements that you don't know where they are coming from?

A. [Lt. Stewart] Yes. Yes sir, he does. I'm trying to think of an example for you. He just sometimes just, it's not—it's like he doesn't know where he is. You will try to talk with him about an issue and he is out in left field talking about other things.

Q. You can't direct his attention to the matter you are trying to talk about?

A. No, you cannot bring him back to talk about what you want to discuss.

\* \* \* \* \* \*

Q. Okay. In regards to his, how he has been in the last week or so, have you experienced any difficulty with Mr. Aragon in the last week or so?

A. He was in the past oh, five or six days, he has been a little more settled than he had been for some time. But we have twice within the last five or six days had to restrain him to his bed for a short period of time because he again started playing with the electrical outlets. We had replaced the outlet, put a cover on it. He was able to break that cover and tear the electrical outlet from the wall so in order to protect himself from hurting himself or damage property we did restrain him to the bed again.

\*   \*   \*   \*   \*   \*

Q. In regards to the question [The State] asked you about you observing me trying to communicate with Mr. Aragon. Would you agree that at the time that I was trying, you observed the one communication that I tried to have with Mr. Aragon and he was again not directed to the conversation that was at hand that he was combative and argumentative and communication was not very effective?

A. I would agree with that, yes sir.

Q. And his responses to the question that I was asking him, posing to him at that time, were not in relation to the questions I was trying to ask him?

A. That's correct.

Q. They were about other subjects which had nothing to do with the questions I was trying to talk to him about?

A. That's right.

Lieutenant Wideman echoed the testimony of Lt. Stewart and testified specifically to the following experiences with appellant:

Q. [Defense Counsel] Have you had occasion to observe and to converse with Mr. Aragon while he has been in Angelina County jail?

A. [Lt. Wideman] Yes sir, I have.

Q. What, if anything, have you observed unusual in regards to his behaviour (sic) or actions?

A. I can only confirm most everything Mr. Stewart said. At times he seemed to be rational and the next time he is completely irrational and we can't control him or do anything with him.

\*   \*   \*   \*   \*   \*

Q. Did you find it difficult on some of those irrational occasions for him to stay on the topic which you were trying to talk to him about?

A. Yes sir. He would never stay on what we were trying to discuss. He would always be talking about something else.

*CROSS EXAMINATION*

\*   \*   \*   \*   \*   \*

Q. [The State] And from your talking with him does he know he is in jail?

A. [Lt. Wideman] At times he does. Other times I don't think he does.

Q. Where does he seem to think he is at on those other times?

A. I really don't know sir.

Q. Not even able to keep him on the same conversation long enough to find out?

A. Right.

The only expert witness to testify at the competency hearing was Dr. Joseph Kartye, a psychologist who interviewed appellant for approximately two hours some eight days prior to the competency hearing. Dr. Kartye testified as follows:

Q. [Defense Counsel] And at the time that you examined him what did you find?

A. [Dr. Kartye] I found that he was extremely disoriented, that even though he could answer questions, he had difficulty staying on track as to responses to those questions. He had a problem with staying on a topic. He had some problems dealing with time concepts when you would ask him approximately what time or what date a certain event had taken place he would give general answers rather than specific ones. His response to some questions was bizarre, I mean his response was even (sic) related to the question being asked. Example: One of the questions he was asked the reason for doing what he did and he told a long involved story about Authur (sic) Temple owing him money and that he was justified in doing what he did because Workman's Comp. was not paid. And it— the story was fragmented and disoriented

and what it reflected was a very severe disturbance in thinking processes where he had difficulty concentrating, remaining on a subject. He was delusional in that he had a false belief pertaining to why he was in jail and what was going on around him and he felt like he had been justified in doing what he had done. He denied having any type of emotional difficulties whatsoever (sic). And indicated that there was nothing wrong with him.

\*    \*    \*    \*    \*    \*

Q. In regards to Mr. Aragon's mental state what did you determine or arrive at?

A. My job basically was to determine whether or not he was competent to stand trial on the charges as well as whether or not he was insane at the time of the event at the time it occurred. And that involved to come to some type of conclusion, what knowledge did he have of the nature of the proceedings against him, did he realize the full implications of those and would he have been able to assist his attorney in his defense, and although he was aware of the charges he did not have an emotional reaction to that from the standpoint he did not seem to be overly concerned about those charges and what was going on, which is an indication generally of a severe mental problem. He also was so disoriented in responding to my questions I do not feel he would be able to respond adequately to any questions his attorney might ask, so for that reason I found him not competent to stand trial.

Q. And is this the opinion that you formulated in your opinion here today that he is not competent to stand trial?

A. That is correct.

During the course of Dr. Kartye's testimony appellant introduced into evidence, without objection, what is simply referred to as Exhibit Two. Exhibit Two is described as a copy of a newspaper article and a copy of a written commentary on the article by appellant. Dr. Kartye then described the article to the jury and read the contents of appellant's commentary. This occurred as follows:

Q. [Defense Counsel] Yes, your honor. If you could, doctor, read the statement to the jury that he wrote and if you could explain to us how that is consistent with your diagnosis?

A. [Dr. Kartye] He wrote that, I'm assuming, in response to this article and this picture, is that correct? Okay, and what we have here is a picture of two boys fighting with some other boys that's an article about boys run loose and raised on the streets of Brazil. What he wrote, "In there those two boys look a like (sic), are they brothers? They look like brothers fighting over something, you know what? I dreamed I was a baby, it was like a night mare (sic), there was this big beast with seven heads, all wild beasts, all devastating in a pool of blood almost like a lake, bubbling like a hurricane. Look I feel I have a sister with this name. The battle was all in darkness but strange I could not see the moon or the stars but yet it was miraculous. I could see the double edged sword penetrating in the heart of the fire-breathed beast with the wings of an angel. Yet in my humiliation I woke up scared, bruised and beaten with the heart of an angel, solid rock full of joy, pain, sunshine and rain and I cried, 'No more tears, amen.'" Now—

Q. What does that indicate to you, doctor?

A. Well, you can see disorganization in thinking because he starts on one topic talking about the boys, direct reference to this picture and then within a sentence or two he has totally, completely left the story and he is out on a tangent talking about angels and hurricanes. So there is several different thought changes in here and some of it toward the middle of this writing does not make sense at all. If you thought you were supposed to get some kind of story from what I just read and you are trying to figure it out, don't worry because you can't. It might seem very coherent or logical to the person writing it at the time but to an outsider such as us we don't have a frame of reference so it makes no sense at all.

Q. If I were to inform you that Rusk State Hospital felt that he was psychotic,

would that be consistent with what you found?

A. Yes.

Q. And what do we mean by psychotic?

A. Psychotic means a person is so impaired in their thought processes that they do not have a good awareness or contact with reality and because of this they are unable to function in many areas of day to day living.

On cross-examination, a brief but compelling piece of testimony was elicited from Dr. Kartye as follows:

Q. [The State] Is it unusual for someone with the defendant's mental condition to have periods of, I hate to use the word normal, but of lucidness where he can stay on track and can converse normally?

A. [Dr. Kartye] Yes, that does happen.

Q. Okay. So you would not describe that as being unusual?

A. No.

\* \* \* \* \* \*

Q. Would you say that he is right now, that he is independently unable to make a rational and informed decision as to whether or not to submit to treatment?

A. Yes.

Q. Does he require, in your estimation, in-patient mental health services?

A. Definitely.

The last two witnesses to testify were the appellant and his mother. We first provide portions of appellant's direct examination testimony.

Q. [Defense Counsel] All right. Mr. Aragon, have you been in the Angelina County jail for the last, since July 11th?

A. [appellant] I was really booked, you know, there is something not right here because I don't know what you all have against people from West Texas but I know we don't get along for one reason when I was booked I'm pretty sure it was Friday July the 15th. And because I went to the emergency room right here in Lufkin, Lufkin Memorial Hospital. I went to get treatment on my knee, I went to get

some x-rays and instructions what, how to treat it and everything.

\* \* \* \* \* \*

Q. What does it [commentary in Exhibit Two] mean?

A. Oh, it just means—

The Court: Speak up.

A. It just means about the dream I had, you know, it's basically a dream and I woke up and I wrote it down on paper. Nothing that would affect nobody here, you know, just something personal really, you know. There is other things that I—I was, Mr. Stewart was talking about not getting along with people and where I am from it's West Texas and this is East Texas but the part about it is you all seem to treat inmates very differently from people that, like I guess you are not used to people from West Texas with Spanish, Mexican–Americans or whatever, you know.

\* \* \* \* \* \*

Q. Do you recall when you went to Rusk and got some medicine?

A. Yes sir, I do.

Q. What, if anything, did that medicine do for you?

A. Well, it really didn't help me much but give me a bunch of side effects. You know, I really didn't need it because—the problem would have been solved if I had got, you know, got what is required by law, you know, a grievance, you know. I could write my name on paper and things like that, you know. And this is basically this point I have a better handwriting than that. My mother is here to prove that. I have no problem in getting along with people inmates or anybody out there outside of this court house.

\* \* \* \* \* \*

Q. Do you recall pacing or walking in your cell and tearing the bible up and throwing it down?

A. Yeah, I recall doing that because I requested for a grievance and up to this date from the day I got booked and arrested, you know, I requested for a grievance and I never got anything but a request to

get a grievance and the lieutenant really wasn't in any way helpful to what I asked. You know, I tried to be a good, law abiding inmate and citizen I'm not too but anyway I can't really cope with people who don't have a—

Q. What does that have to do—Mr. Aragon, what does that have to do with your tearing up the bible?

A. Well, you know, I'm in here and I should be dressed a little bit more appropriate, you know. I am not clean shaven and the lieutenant is. I asked a couple of days before that if I could get, you know, a razor and stuff like that to shave.

Q. Mr. Aragon, what does that have to do with you tearing up the bible?

A. That's got to do—well, people don't get treated the way they that they are treated. I tore up the bible because the lieutenant and his jailers, he comes in and I don't know what his hours are, he comes in and works his hours and takes off and the reason I tore up the bible is because I wasn't getting my proper medication. Medication I'm talking about is some over the counter drug called Benadril (sic).

On cross-examination, the State led appellant through an identification of the people present in the courtroom as well as having appellant admit that he [appellant] could talk to his defense counsel about the pending criminal charge. Appellant explained that he could but does not discuss the case with his counsel because he does not feel he is guilty of the charge, and because counsel should not know everything about appellant's personal life. Appellant was asked what he was charged with and correctly responded that he was charged with unauthorized use of a motor vehicle. A portion of the State's cross-examination reflects the following:

Q. [The State] How come you had to climb upon the shower to watch t.v.?

A. [appellant] Because Angelina County is over populated and I have been sleeping on the floor in J Tank and I have been sleeping on the floor, you know, when I got here and when I was in L Tank to J Tank I slept on the floor. I did have a bed a couple of days and I got moved out to Separation Three.

Q. My question is why did you have to climb upon the shower to watch t.v.?

A. This is something, you know, nothing wrong with doing that, you know, I could step into it and I can get on top of it, you know. I wasn't planning to jump off of it.

\* \* \* \* \* \*

Q. Okay. Have you ever stopped up the toilet with toilet paper, make them overflow?

A. No, not with toilet paper. I did it with my towel—what am I trying to say?

Q. You stopped up the toilet with your towel?

A. Yeah, it was a towel, I wasn't using it so I thought it was dirty and I never got my laundry done so I thought I would maybe clean it that way.

Q. Thought you would clean it that way?

A. Wash it, yes sir.

Q. You were going to wash your towel in the toilet?

A. I did sir. I didn't try, I did sir.

Q. Did you take it out after that and dry it and use it?

A. I had no choice, yes sir.

\* \* \* \* \* \*

Q. Are you ready to go to trial?

A. I believe this is a trial, yes sir.

Q. Okay. Well, this is a trial on whether you are competent to go to trial, do you understand?

A. I am very competent.

Q. You are very competent?

A. Un huh.

Appellant's mother was the final witness called to testify. She testified through an interpreter. She testified that appellant lived with her along with her other children in Amarillo, Texas. She further stated that she and appellant's brothers took appellant to a local hospital in Amarillo because appellant was uncontrollable. She described his behavior as rowdy, making a lot of noise at night so that her other son could not sleep, talking a lot, kicking doors, and that she could no longer control him by talking to him. She stated that the day before appel-

lant was to be admitted to a mental hospital he [appellant] left Amarillo for East Texas. She was able to locate appellant in Diboll, Texas, staying with some relatives.

At some point during the testimony the State was apparently struck with an epiphany regarding appellant's competency. This is reflected in the following portion of the State's closing remarks to the jury:

I'm in something of a strange position today and I'll tell you why. After hearing the defendant testify and reading the court's charge which I knew what would be in it but really after hearing the defendant testify, I've about come full circle on this, done a 180, an about face on this and I'm inclined to believe the defendant's competent to stand trial, despite what Dr. Kartye says and despite his antics over in the jail.... But consider this, in this instruction and in these instructions they don't say you have to find the defendant is not mentally ill. I think you can come to the conclusion that he is mentally ill, he is off some, he is running a few degrees off dead center and yet that he is competent to stand trial. That's really not all that unusual to have people who don't have— elevator doesn't go all the way to the top, you might want to put it. They are off a few degrees and yet they are competent to stand trial and I would suggest when you heard the defendant testify that's precisely what we have. I think in another regard what else also you are looking at as a mean person, you are looking at an anti-social personality. You are looking at somebody who has no regard for consequences of his behavior and isn't that why we have jails and prisons? ... He made a pretty good comparison so he has a rational understanding of the real world whenever he wants to. I would suggest to you that he may have been shall we say fooling Dr. Kartye, perhaps, pulling his leg, perhaps.... Now that he sees the consequences of misbehaving at the jail is not freedom but rather another trip to a mental hospital he's decided to play it straight with the jury to some extent and let you know that he doesn't want to go to the

mental hospital. Of course not, now he wants to get on with his trial, how he sees he is not going to get out, now he wants to get on with his trial and he wants to have his guilt or innocence determined and if he is found guilty, his punishment assessed. And I suggest that you go ahead and honor his wishes, go back there and answer the first question with a resounding—

MR. MIGUEL CONCHA ARAGON: I suggest your honor, my civil rights.

[The State]: But you answer question number one do you find by a preponderance of the evidence that the defendant, Miguel Concha Aragon is presently incompetent to stand trial for the offense charged against him. I suggest you answer that question no, because he is not presently incompetent. He is presently competent so answer question number one "No". (sic)

We find that after reviewing the entirety of the evidence of the competency proceeding we cannot agree with the State's contentions during its closing remarks. The evidence before us heavily preponderates on the side of incompetency. For whatever reason, it is clear that the proceeding itself did not become adversarial until some point during the State' cross-examination of appellant. Up until then, the State took no issue with any of the observations, opinions, or findings of either of the two jail administrators, or with Dr. Kartye. This resulted in a substantial amount of evidence accumulating in the record favorable to appellant's position and burden of proof. In examining all of the evidence admitted at the competency proceeding we are mindful of the scope of our authority for undertaking a factual review of the evidence. Said authority was recognized in *Meraz* as the Court of Criminal Appeals quoted the following language from *In re King's Estate* [1]:

But Article 5, § 6 of the Constitution, Vernon's Ann.St., is no more to be ignored than any other part of that document, and that provision, with the decisions, statutes and rules based upon it, requires the Court

---

1.  150 Tex. 662, 244 S.W.2d 660, 662 (1951).

of Civil Appeals, upon proper assignment, to consider the fact question of weight and preponderance of all the evidence and to order or deny a new trial accordingly as to the verdict may thus appear to it clearly unjust or otherwise.

*Meraz,* 785 S.W.2d at 154.

Under the entire record of the competency proceeding before us we find that the jury's verdict of competence is indeed so against the great weight and preponderance of the evidence that it is manifestly unjust. Appellant's first point of error is sustained. Because convicting a defendant while he is legally incompetent violates his rights to due process and due course of law, *Hall v. State,* 808 S.W.2d 282, 285 (Tex.App.—Houston [1st Dist.] 1991, no pet.), the judgment adjudicating appellant guilty for the instant offense must be reversed, and the cause remanded to the trial court for a new trial.

REVERSED AND REMANDED.