

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ZENAIDA PEREZ, | § | No. 08-13-00208-CR |
| Appellant, | § | Appeal from the |
| v. | § | 120th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20110D01249) |

# **O P I N I O N**

Zenaida Perez, Appellant, was charged with four counts of indecency with a child. She was convicted and sentenced to four years' imprisonment on Count I and two years' on Counts II through IV.[1] Appellant asserts the jury's finding she was competent to stand trial is against the great weight and preponderance of the evidence. We reverse the judgment and remand for further proceedings consistent with this opinion.

## **STANDARD OF REVIEW**

A legally incompetent criminal defendant may not be put to trial without violating due process. *Turner v. State*, 422 S.W.3d 676, 688 (Tex.Crim.App. 2013); *see Cooper v. Oklahoma*,

---

[1] The sentences were ordered to run concurrently.

517 U.S. 348, 354 (1996)("We have repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process.'")(quoting *Medina v. California*, 505 U.S. 437, 453 (1992)); *Turner*, 422 S.W.3d at 688–89 ("'It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.'")(quoting *Drope v. Missouri*, 420 U.S. 162, 171 (1975)). To be adjudicated competent to stand trial, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and must have a "rational as well as factual understanding of the proceedings against him." *Turner*, 422 S.W.3d at 689 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

A defendant may raise a factual-sufficiency challenge to the jury's adverse finding on his incompetency claim. The seminal case on factual sufficiency in competency trials is instructive. *Meraz v. State*, 785 S.W.2d 146, 147 (Tex.Crim.App. 1990). In *Meraz*, the Court of Criminal Appeals adopted the civil standard of factual sufficiency review of "preponderance of the evidence." *Id.* at 153-55; *Matlock v. State*, 392 S.W.3d 662, 671 (Tex.Crim.App. 2013). When the defendant makes a factual sufficiency claim, he is asserting that, considering the entire body of evidence, the jury's rejection of his incompetency plea was so "against the great weight and preponderance" of that evidence to be manifestly unjust. *Matlock*, 392 S.W.3d at 671; *Meraz*, 785 S.W.2d at 154-55. We view the entirety of the evidence in a neutral light and defer to the jury's credibility determinations. *Matlock*, 392 S.W.3d at 671; s*ee Morris v. State*, 301 S.W.3d 281, 292 (Tex.Crim.App. 2009). We sustain Appellant's factual sufficiency claim only if, after setting out all the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, we clearly state why the verdict is so much against the great

2

weight of the evidence so as to be manifestly unjust, conscience-shocking, or clearly biased. *Matlock,* 392 S.W.3d at 671. A clearly wrong or unjust verdict is one which "shocks the conscience," or "clearly demonstrates bias." *Santellan v. State,* 939 S.W.2d 155, 164-165 (Tex.Crim.App. 1997). A reviewing court may not substitute its judgement in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Matlock,* 392 S.W.3d at 671.

In Texas, "[a] defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." TEX.CODE CRIM.PROC.ANN. art. 46B.003(b). A defendant is incompetent to stand trial if he does not have "(1) sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." TEX.CODE CRIM.PROC.ANN. art. 46B.003(a). Facts relevant to this determination include whether a defendant can.

## TRIAL

During the competency trial, the defense called three witnesses: Dr. Angel Rodriguez-Cheverez, one of the psychiatrists who had examined Appellant; Dave Contreras, Appellant's former defense counsel; and Appellant's sister-in-law, Consuelo Perez.

### Dr. Angel Rodriguez-Cheverez

At the competency trial, the jury heard the expert testimony of Dr. Angel Rodriguez-Cheverez, a forensic psychiatrist, who after examination, found Appellant incompetent to stand trial. Further, in his report, he opined, to a reasonable degree of medical certainty, he found it was "highly unlikely [and a] poor possibility" that she could be restored to competency given that her condition would "last a lifetime." Dr. Rodriguez-Cheverez diagnosed her with mild mental

3

retardation, which was corroborated through psychological testing which determined her I.Q. score to be 60. According to Dr. Rodriguez-Cheverez, an I.Q. of 60 is equivalent to an eight-year-old.

Appellant told Dr. Rodriguez-Cheverez that she had been born in Mexico. While in Mexico, she attended school for special education. Eventually she graduated from high school in Houston through special education. She had never been gainfully employed, because she is "too slow" and has difficulties learning anything new. She receives social security benefits. She was married for a few months and has been separated for about three years. Dr. Rodriguez-Cheverez found her "having difficulties understanding my questions." She was cooperative, no signs of thought disorder, not delusional, but was a poor historian with "difficulties arranging events in a chronological and accurate manner." In fact, Appellant's sister Andrea, who accompanied her to the evaluation, assisted in completing the evaluation.

Dr. Rodriguez-Cheverez based his finding of incompetency on Appellant's inability to "understand exactly what goes on in a court of law and be able to participate appropriately" in her defense. His written report indicates Appellant did not understand what a lawyer would do for her; she had no idea of the prosecuting attorney's role; she could not explain who a judge is or what a judge does; no comprehension of the jury's role; and had no idea the role of a witness. He also explained to the jury that he was certain Appellant was not malingering. He testified Appellant would not be able to consult with her lawyer with a degree of rational understanding and did not have a rational and factual understanding of the charges against her. Dr. Rodriguez-Cheverez stated Appellant would never gain the ability to consult with her attorney with "a degree of rational understanding" or attain a "rational and factual understanding of the charges" against her.

4

Dr. Rodriguez-Cheverez also testified that he based his opinion on cognitive testing by Dr. Natalicio, a psychologist, who measured Appellant's I.Q. He, further explained, that he also based his opinion on a second psychiatric evaluation by Dr. Cynthia Rivera. Dr. Cynthia Rivera, had evaluated Appellant and found her competent initially, but after a second evaluation agreed with Dr. Rodriguez-Cheverez, finding Appellant, ultimately, incompetent.

### Dave Contreras

Appellant's former defense attorney, Dave Contreras, testified that Appellant does not have the ability to "disclose pertinent facts to counsel." Mr. Contreras attested that Appellant was unable to effectively consult with him for the purposes of her defense. According to Mr. Contreras, when he spoke with her, "sometimes it's just like it's not registering. Sometimes I'll ask her a question and the answer won't come. She won't answer, so it's either she didn't understand me or she didn't hear me." Further, Mr. Contreras said, "[a]nd I have to go over and over and over again, and she has a very short-term memory problem." He told the jury that he had to "repeat everything twice" and "I talk to her one week, the next week she won't remember what we discussed." Mr. Contreras stated that Appellant did not understand what he would tell her about the case and could not make decisions. Mr. Contreras opined that she would be "annihilated by cross-examination" if she were to take the stand in her own defense because everything must be repeated to her over and over again, she is not responsive, and she forgets what she had told him earlier.

On cross-examination by the State, Mr. Contreras rejected the proposition that Appellant would be better served by female defense counsel, answering "[n]ot with her limitations. It doesn't matter." The State posited that Mr. Contreras, as an attorney, was not qualified to render an opinion as to Appellant's limitations. Mr. Contreras responded,

5

> Well, when she can't help me prepare her defense, when she can't relate facts to me, when she doesn't have a rational understanding of the charges against her, it's like going into a courtroom with my hands tied behind my back. It's like I would be discovering the case against her in court, and that would be malpractice for me to do that.

Mr. Contreras acknowledged that he did not know what was going on in Appellant's head; or know why she does not answer or know what Appellant remembers and what she does not remember or whether she is lying to him. He stated Appellant did not remember meeting him which had occurred some three months prior. When pressed, Mr. Contreras told the jury that when he encountered Appellant again, he asked her, "[d]o you remember me? I represented you in the past." Appellant just looked at him. Mr. Contreras admitted he could not read Appellant's mind.

When questioned as to the basis of his opinion that Appellant could not testify, Mr. Contreras responded, "[j]ust in talking to her. I mean, we have enough experience to understand when somebody can testify, as you know. You deal with complaining witnesses, and we know when somebody can't testify, their limitations . . . ." Mr. Contreras acknowledged while it is possible Appellant does not want to testify or could be malingering, he did not believe that to be the case. In response to whether he could "get in her head," Mr. Contreras stated "[b]ecause she doesn't remember when I just talked to her an hour earlier." Again the State pressed "[c]an you get in her head?" Mr. Contreras responded, "I can just go by observations." The State followed up "[s]o looking at somebody, you can tell what's going on in their head?" He answered, "[n]o. If I ask somebody a question and they can't answer." The State challenged whether Appellant willfully refuses to answer, and Mr. Contreras explained "[s]he tries. That, I've got to hand it to – I mean, she tries to communicate, but she can't help me. She can't."

When the State questioned whether Mr. Contreras was sufficiently qualified to opine on Appellant's ability to consult with him, he answered "[a]ll I can tell you is the difficulty I had with

her when I'm trying to prepare for trial." The State asked whether Mr. Contreras should be testifying to Appellant's mental abilities given that he is not a doctor and only has a law license, he responded "--one of the things that--what you look for in competency is the client's ability to consult . . . to a reasonable degree of rational understanding as to the charges against them . . . ." Mr. Contreras acknowledged he was not a mental health expert but that he is assigned a majority of cases involving mentally ill clients. He explained that he had seven years on-the-job training and experience in handling severely mentally ill clients, twenty-three years practicing law. Mr. Contreras told the jury that he has been unable to consult with Appellant to prepare the case for trial or get her ready to testify.

### Consuelo Perez

Consuelo Perez, Appellant's sister-in-law, testified that Appellant lived with her. Consuelo testified she had brought Appellant to court that day and takes her to the doctor when she is ill. According to Consuelo, Appellant "forgets many things. She's ill. She's disabled." She stated that her husband, Appellant's brother, has authority to act for Appellant through Social Security. Consuelo said she has known Appellant twenty-nine years and has lived with her the last eleven months. Consuelo explained that Appellant lived with her mother all her life until her mother died about four years ago. After that she went to live with her older sister, Enriqueta Codina. Consuelo acknowledged Appellant was married for two years but her husband would take Appellant to her mother's house every day. Appellant would help take care of her mother, who was blind and had diabetes. Consuelo stated Appellant has never lived on her own. Appellant cannot manage her bank account or take care of her money monthly, so Appellant's brother does that. She can pay bills, so long as someone accompanies her and tells her what to do. According to Consuelo, Appellant cannot buy groceries without assistance and has never held a driver's license. Nor can

7

Appellant get on a bus or get to the courthouse on her own. Appellant has gotten lost going to the restroom in the courthouse. As a result, Consuelo does not leave Appellant alone at all. When Consuelo attempts to explain what is going on with Appellant's case to her, "[s]he forgets many things and she doesn't know how to explain to me what's going on here." Appellant asks Consuelo questions, but sometimes does not understand what Consuelo tells her. Consuelo repeats things to Appellant three or four times "so that she understands what I'm trying to tell her." According to Consuelo, Appellant does not remember who her attorneys are and has not remembered any one of them for longer than one day.

Under cross-examination, Consuelo admitted that Appellant and her husband lived together for a couple of years and did not live with her mother all her life. Consuelo also admitted that Appellant's ex-husband owned a truck that Appellant drove within an apartment complex. Consuelo stated Appellant did not take the truck into the street but acknowledged she did not observe Appellant every single minute of the day and could not be certain if she drove out into the street. Consuelo acknowledged Appellant could drive but did not have a license. Consuelo accompanied Appellant to the doctor and goes in with her while she is being examined. Consuelo explained that her husband "got custody" of Appellant eleven months prior to the trial and Appellant has been living with them since then. Consuelo told the court that prior to Appellant living with her and her husband, she would see her mother-in-law and Appellant every weekend. Consuelo testified they would visit with her mother-in-law and Appellant either at home or go to the park. Appellant would cook, feed, and move her mother from one point to another and bathe her. Appellant was very close to her mother who suffered from diabetes and was blind. Appellant was very good to her mother and took care of her as a daughter should according to Consuelo. Consuelo attested that Appellant took good care of her mother until she passed away in April 2009.

8

Consuelo stated that Appellant had never been to a club or a party. The State introduced a picture of Appellant with two other ladies purportedly showing wristbands indicative of attendance at a nightclub.

Consuelo acknowledged that Appellant is not subject to a guardianship and the only documents Appellant's brother must act for her come from the Social Security office. Appellant's brother is listed on Appellant's bank account first and Appellant second for the last six months prior to trial. Prior to that, Appellants' sister, Enriqueta Codina, was listed first.

Appellant assisted Consuelo in the care of her granddaughter, after she was born in 2011, while her daughter was having surgery. However, Consuelo stated that she never left Appellant alone with her granddaughter. Consuelo was aware of her niece's children, twin premature girls. Consuelo agreed with the State that Appellant was smarter than an eight-year-old, and the family trusted her to take care of her disabled mother. Consuelo conceded that Appellant's mother was well cared for by Appellant and an eight-year-old could not be trusted to do what Appellant did with her mother. Appellant also took care of the twin girls along with her mother, after they were taken from the oxygen, thirteen years before the trial. At the time, Appellant and her mother took care of the twin girls, Appellant's mother was fifty-three years' old and her diabetes was under control. The State introduced a picture of Appellant holding the twin infant girls into evidence. Consuelo acknowledged the picture showed the girls with oxygen tubes in their noses. Consuelo explained that Appellant travelled to Denver to help their mother care for the twins. Consuelo conceded she was wrong when she stated Appellant took care of the girls after they had been weaned off the oxygen. Consuelo stated that the mother of the twins was also disabled as she had been born without a hand. According to Consuelo, Appellant helped the disabled mother with the care of the twin girls who had been born premature and on oxygen. Consuelo stated that Appellant

9

had also looked after the twin girls' mother and her brother, Ubaldo Codina, when they were children. Consuelo clarified that Appellant assisted with the care of the twins' mother and Ubaldo, when they were brought to Appellant's mother's house to be cared for. Consuelo acknowledged Appellant also babysat Ubaldo's children, a four-year-old girl and two boys that were a little bit older. According to Consuelo, Appellant took care of all three children while their parents, Ubaldo and his wife went to school at night. Consuelo told the jury that Appellant had never worked outside the home and was not paid for any of the work she did for family members.

On re-direct, Consuelo explained Appellant's mother went to look after the twin premature babies on oxygen in Denver and Appellant only accompanied her. Consuelo acknowledged that Appellant would help her mother by changing the babies' diapers and feeding them. Consuelo told the jury Appellant could not take the babies to the doctor or even go shopping at a grocery store unassisted. Consuelo stated Appellant only went grocery shopping with her husband or father. Consuelo testified that Appellant can change and bathe on her own but must be reminded to take her medicine.

### State's Case

The State presented seven witnesses. They were Appellant's nephew and his wife, Ubaldo Codina, Jr. and Claudia Holguin Codina; Appellant's niece, Kathleen Codina; and Appellant's nephew, Julio Cesar Codina.[2] The three remaining witnesses were Claudia Codina's mother, Elvira Padilla de Perez; her father, Barbaro Perez Meza and her brother, Jose Antonio Perez. The State's examining psychiatrist, Dr. Cynthia Rivera, who ultimately found Appellant incompetent, was not called to testify.

---

[2] We note that the alleged victim of the underlying indictment is a child of Ubaldo Codina and Claudia Holguin Codina, a niece of Kathleen Codina, Julio Cesar Codina, and Jose Antonio Perez; and a granddaughter of Elvira Perez and Barbaro Perez. However, the family relationships to the alleged victim were not disclosed at trial.

**Ubaldo Codina, Jr.**

After Appellant's mother died, Appellant went to live with Ubaldo's mother, Appellant's older sister. Later, Appellant lived with Ubaldo and his wife to help them because they were both going to school. Ubaldo worked eight to twelve hours a day and went to school at night. Appellant came to stay with Ubaldo and his wife to take care of their three children for about two to three months. Appellant shared a room with his three-year-old daughter and kept some of her clothes there. They left the children with Appellant once a week for four hours. His two older boys were twelve years' and nine years' old at that time. She babysat the children, cooked, fed them, and made sure they bathed. Ubaldo stated that Appellant would clean their house, cook for the family, walk with the kids around the block, play cards with the kids, watch TV with them, and put movies on.

Ubaldo had known his aunt, Appellant, all his life and had no concerns about her mental ability. He told the jury that Appellant can cook Mexican food very well and make tortillas. Further, Appellant could carry "normal family conversations." Ubaldo explained that as a correctional officer for nine years, he could readily recognize if someone "was mentally retarded [or] slow" and he never considered Appellant as "being like that." He stated that if he had thought she was, he would have never left her with his kids. Ubaldo recalled Appellant helping his sister in Colorado with her new-born twins but did not believe his grandmother would have accompanied Appellant.

Ubaldo acknowledged he knew Appellant received SSI.[3] However, he stated he did not know why she received the benefits nor was he ever told why. Further, he had never been told that Appellant was mentally retarded. Ubaldo stated that Appellant would take care of all the kids in the family, anytime there was a "get together," someone would bring Appellant so "she could take care of more kids." He admitted that Appellant only enjoyed doing that "sometimes." He had never heard anyone in the family question Appellant's ability to babysit kids. Ubaldo also witnessed her taking care of other family members' children in Houston. He has also seen her drive her husband's truck in the apartment complex to wash and to a nearby convenience store. He also observed Appellant with her husband. Ubaldo stated Appellant and her husband appeared to have a normal relationship in the beginning.

Ubaldo believed Appellant is smarter than an eight-year-old. He had attended her high school graduation and knew she was in special education classes. However, he stated he did not know why she was in the special education classes as he was still a child then. Appellant participated in family activities such as tag, handball, frisbee, and cooking. He stated, "[s]he would do anything." Ubaldo testified that she was a good softball player and could catch the ball. She would also play *Uno*, a card game and *La Lotteria*, a Mexican bingo game. Ubaldo testified that Appellant was very fast, and she would pay close attention during the Mexican bingo game winning "[a]ll the time." In addition to playing softball, Appellant also played handball and tennis. According to Ubaldo, she was very athletic, and she was able to follow the rules of the game "all

---

[3] The SSI program is administered by the federal Social Security Administration (SSA) to provide cash assistance to individuals who are aged, blind, or disabled and who have limited incomes or resources. *See* 42 U.S.C.A. §§ 1381-1381a.

the time." Ubaldo told the jury he never saw her have any problems following the rules of a game "because she was really good on anything, any sport."

Ubaldo told the jury his mother, Enriqueta Codina handled Appellant's social security funds for a short period of time before his uncle took over. Ubaldo acknowledged that Appellant's mother oversaw her social security money before Enriqueta took over. According to Ubaldo, while he was aware of the money, he was completely unaware as to why Appellant received it or why his grandmother and his mother oversaw the funds. Ubaldo insisted that Appellant had a card and he never witnessed any other individual handle Appellant's money. He stated he misunderstood and he was unaware if his mother handles Appellant's funds, but that his mother was "in charge" of Appellant after his grandmother passed away. He could not recall when his grandmother passed away nor did he know how old Appellant was. Eventually under cross-examination, Ubaldo conceded his grandmother died when he was thirty-three or thirty-four. At the time of trial, Ubaldo stated he was thirty-six years of age. Ubaldo agreed that Appellant was at least forty years' of age when her mother died, and someone had to take possession or custody of her. Ubaldo told the jury that the conversations with Appellant were about cooking, cleaning, and taking care of kids.

Under re-direct, Ubaldo stated his grandmother oversaw Appellant because his grandmother relied on Appellant for everything, like cooking and cleaning, so she was afraid of losing Appellant. He refuted the idea that his grandmother had to take care of Appellant. He said his grandmother was afraid Appellant would leave her because Appellant "was in love" and "wanted to get married" to the next-door neighbor. According to Ubaldo, Appellant would tell him stories about her love interest. When asked if these were adult conversations, he responded, "[y]es, big time, yes." Ubaldo spoke to his grandmother about Appellant getting married. His grandmother did not want Appellant to get married, but the whole family agreed and eventually

13

his grandmother acquiesced. Appellant then married. Ubaldo testified that before Appellant married, she took very good care of her mother and was very capable.

On cross-examination, Ubaldo admitted he was unaware that Appellant's husband took her every day to take care of her mother. After his grandmother's death, Ubaldo explained his mother took Appellant in not because she needed to be taken care of and handle her funds but rather because "she didn't want to go with nobody else but my mom, but not because somebody had to take care of her."

**Claudia Holguin Codina**

Claudia testified she has three children, is married to Ubaldo Codina and Appellant is her husband's aunt. At the time of trial, she was attending school and volunteering as a nurse. According to Claudia, when Appellant came to stay with her and her husband it was "Just to, I guess, hang out." She initially testified Appellant did not take care of her kids. Later in her testimony, Claudia stated Appellant took care of the children during the day on one occassion. Claudia told the jury that Appellant did not keep any clothes at Claudia's house. She stated Appellant did bathe her daughter and put her to bed. Claudia was going to school at night and Appellant would take care of the kids. According to Claudia, that occurred only once. Claudia also testified that Appellant would cook for them mostly Mexican food. Claudia reported that Appellant had no difficulty cooking the Mexican food and she did not consider Appellant slow or mentally retarded. Claudia told the jury that Appellant and she had conversations about clothes, make-up, and hairstyles. Claudia never perceived Appellant as a child. Claudia had known Appellant about ten years and seen her "on and off." Further, Claudia explained Appellant could dance to Mexican music. In addition, Claudia stated Appellant would watch TV *novelas* and could

14

only speak in Spanish. Claudia stated Appellant did not read books. Claudia told the jury she had spent time with Appellant, gone places with her, and knew her well.

In addition, she stated Appellant had a cell phone that she could use, and that Claudia was unaware if Appellant ever needed help managing her money. Claudia recounted that on one occasion, Appellant withdrew money from an ATM machine with a pin number. Claudia admitted she knew that Appellant received SSI but stated she was unaware why Appellant received the money from the government. Claudia had observed Appellant playing cards and *Loteria*. Claudia stated that only adults play that game not children. When Claudia was asked if Appellant can "keep her beat in her feet and everything going the right direction?" She responded "yes" and that she is a good dancer. Claudia identified a photograph of Appellant at a *Quinceanera* in which she starting to dance a waltz. Claudia observed Appellant with her husband and believed it to be a "normal relationship."

Claudia told the jury that Appellant had the ability to consent to the marriage and was not certain if Appellant was divorced. Claudia acknowledged that Appellant had left her husband. Claudia stated that Appellant left her sister's house to come stay with Claudia of her own volition and was not subject of a guardianship. In fact, Claudia told the court that Appellant came to Claudia's house "because she wanted to." Further, Claudia said Appellant made that decision on her own and Appellant did not have to get permission from the court or social security to move in with Claudia.

Claudia opined that Appellant is much smarter than an eight-year-old and "can do everything." Claudia testified Appellant can dance, cook, manage her money, interact with adults,

and children. Claudia stated that Appellant "can do mostly everything." Further, Claudia attested that Appellant is smart enough to make her own decisions and Claudia would not have left her children with Appellant if she did not think Appellant was capable.

Under cross-examination, Claudia admitted she did not know how Appellant's funds were deposited in her account but knew that Appellant did not have a job to earn the money in her account. When questioned as to whether Claudia was aware her mother-in-law handled Appellant's money, Claudia responded that she did not know. Claudia maintained that Appellant stayed at her house less than one week and not two or three months.

### Julio Cesar Codina

Julio is Appellant's twenty-one-year-old nephew. Appellant lived with him, his mom, and their family about a year before the trial. His mother is Enriqueta Codina and his sister is Kathy Codina. Appellant lived with him, his mother, his sister, and her two children, and the sister's "baby daddy." He explained that his mom, Enriqueta Codina is Appellant's older sister. Julio stated that Appellant cared for his sister's two daughters, a three-year-old and a four-year-old. He told the jury Appellant just cooked and cleaned. When asked by the State whether he considered her to be mentally retarded, he replied "she's aware of her surroundings. That's all." Julio testified Appellant cooked "anything," and "[s]he makes tortillas – that's my favorite thing about her, but – food like rice, beans, cooks meat." According to Julio, he has held a conversation with her and she understands, but "[s]ometimes she would ask me to repeat myself . . . ." Julio testified that Appellant did not forget how to make tortillas, or cook, or how to get dressed.

The State asked if Julio had ever thought of her as slow, to which he replied, "[a]t times." However, he never worried about Appellant taking care of herself or his nieces. Julio stated Appellant would play with the girls, play cards, and color coloring books with them. Appellant

16

fed them, bathed them, and was left alone with them. Julio said he never had any concern of the girls being left alone with Appellant. Julio opined that Appellant is a lot smarter than an eight-year-old. He agreed with the State that Appellant is not a rocket scientist, but neither are most others. Julio would observe Appellant clean, listen to the radio, and play cards with Julio's father. Appellant would play "Go Fish" with a regular poker deck, and on a couple of occasions "Solitaire." Julio reported Appellant had no difficulty playing "Soltaire." Julio considered Appellant a regular adult because she "walks around like to the stores and cooks, cleans." Julio also observed Appellant grocery shopping by herself. Julio explained that Appellant would grocery shop for his mom or for herself. Julio stated Appellant would walk to the grocery store on her own. Julio was aware Appellant had graduated from high school. Julio testified Appellant would walk to the grocery store, some seven to ten blocks away and purchase groceries. According to Julio, Appellant did not get lost or forget the groceries and would pay either with money she was given or with her card.

Under cross-examination, Julio stated he was unaware Appellant participated in special ed classes in high school. Julio had taken Appellant to the store and had seen her drive as a child but did not know if she has a driver's license. Julio affirmed he spoke to Appellant about her cooking, her tortillas, card games, and family members, but he had never discussed politics, city government, court cases, or issues with police with her. Julio admitted that when he saw Appellant playing Solitaire, he had no idea whether she was playing correctly or not.

Julio, during re-direct examination, told the jury he had seen Appellant drive a vehicle on the roadway in the afternoon when he was eleven years old. Julio testified Appellant married his grandmother's neighbor.

**Kathleen Codina**

17

Kathleen testified that she was twenty-five years' old, the mother of two girls aged five and six, and the daughter of Enriqueta Codina. She explained that Appellant is her mother's sister. Kathleen stated she had lived with Appellant and had allowed her to take care of her daughters up "to a certain point." Kathleen said most of the time she was home, and Appellant would babysit when Kathleen had to leave the house "occasionally." Kathleen never doubted Appellant's ability to look after the children. However, Kathleen testified she considered Appellant "slow." Kathleen stated that she thought Appellant was slow because "she repeats the same thing over and over." Kathleen agreed with the State that Appellant is smarter than an eight-year-old. Kathleen asserted Appellant is "[w]ay smarter than an 8-year-old." Kathleen stated Appellant cleaned, cooked, and Kathleen did not have any problems conversing with her. She had never seen Appellant drive a car. Kathleen testified Appellant did not have a problem understanding whatever Kathleen asked of her.

Kathleen explained that Appellant "repeats her same conversation like two, three times, but she understands and she know what she's saying." According to Kathleen, Appellant routinely repeated her conversation, but Kathleen pointed out she does the same and she is twenty-five years old. The State asked if it was akin to what older people do when they repeat the same stories over and over, to which Kathleen answered in the affirmative. Kathleen told the jury she believed Appellant understood her because Appellant would answer her appropriately. Kathleen testified Appellant could identify colors correctly.

Kathleen stated Appellant lived with her and her family for three years. Kathleen and Appellant were together in the home all day. Kathleen told the State that she did not have to take care of Appellant. Kathleen explained Appellant would go the grocery store with Kathleen's mom. Kathleen told the jury that Appellant would choose the things that she wanted to buy at the store

18

and had no difficulty doing so. Further, Appellant had no difficulty cooking a meal. Kathleen explained that her sister would drive their mom and Appellant to the store. Kathleen affirmed that her mom did not have to babysit Appellant.

When the State asked, "why would your mom take her?" Kathleen responded, "[b]ecause my mom was her – like, her guardian." Kathleen explained that her mom was not Appellant's "legal guardian." Kathleen told the State that her mom "receives, like, her SSI money, and my mom was, like, the one that was in charge of it." Kathleen said her mom "would take her – the money out so she can buy her groceries or whatever she needed – her expenses." Kathleen stated her mom would handle the money for Appellant and help Appellant only with "the money situation."

Kathleen told the jury that Appellant is not very good with money because "she'll just waste it on anything. Like, my mom would get her – give her her card – her debit card and she would get her money out and then she would give it back to my mom because she would misplace it." Kathleen further testified that like her aunt, the Appellant, she is not very good with money and Kathleen said, "[i]f I get it, I'll waste it all." The State asked again if Kathleen's mother was the guardian over the money and Kathleen answered yes. However, Kathleen stated that her mother was not Appellant's guardian over "the rest of her life." Kathleen said she had seen individuals who were mentally retarded, but did not believe Appellant to be mentally retarded. Kathleen stated she was sure because mentally retarded people cannot do what Appellant can do such as cook, clean, and hold a conversation. Kathleen knew Appellant married but did not attend the wedding.

Under cross-examination, Kathleen conceded her conversations with Appellant concerned cooking, cleaning, and taking care of kids. Kathleen observed Appellant would also talk about

when she lived with her mother and stories "from before." Kathleen said Appellant would talk about cooking and cleaning for Kathleen's grandmother. Kathleen explained Appellant "speaks about [cooking and cleaning] because that's something that she does on a daily basis." Kathleen admitted that is "pretty much all" Appellant "does on a daily basis." Kathleen told the defense that her mother was just the guardian of the SSI funds from the Social Security Administration. Kathleen stated her mother told her that Appellant received the money because Appellant is mentally disabled. Kathleen conceded that "the reason [Appellant] has to have somebody else to take care of the money is because she can't because she's not mentally capable of doing it herself."

Kathleen, on re-direct examination, reiterated that Appellant was mentally disabled but she was never told that Appellant was mentally retarded. Kathleen has no idea what mental disabilities Appellant suffers from.

### Elvira Perez

Elvira is the mother of Claudia Codina and the mother-in-law of Ubaldo Codina. She has known Appellant for about fourteen years. Elvira would see Appellant very infrequently at family reunions. She saw Appellant cook, make flour tortillas by hand, make soup, and bake beans. Elvira acknowledged that it is hard to make flour tortillas. She also said Appellant would make pasta soup from scratch which Elvira viewed as a difficult task. Further, Elvira observed Appellant would do this on her own without any difficulty. She never saw anything wrong with Appellant. She spoke with her on occasion and Appellant never appeared mentally slow or mentally retarded. She never saw Appellant take care of children. She spoke to Appellant about her wedding. Elvira attended a bachelorette party for Appellant. On that occasion, they played games and dinner was served. Appellant participated in the games, and according to Elvira, had no difficulty following along. Elvira had only seen her twice, once at the bachelorette party and the second at Elvira's

20

grandchild's birthday party. Each time she saw Appellant, she appeared normal to her. Elvira was aware that Appellant had married and had what appeared to her "a normal marital relationship." Elvira told the jury that Appellant cooked for her husband. Elvira saw her at her grandson's birthday party and Appellant helped to serve food and was very hardworking. To Elvira, Appellant served the food like an adult not a child. The State asked if Appellant played on the swing set with the children, to which Elvira responded no.

Under cross-examination, Elvira conceded she had never spoken to Appellant about; President Obama, immigration problems in the U.S., City Council elections in El Paso, school district problems in El Paso, Elvira's checking account, and Appellant's checking account. Elvira acknowledged that Appellant had never driven her to the store or the doctor. Elvira was unaware that Appellant does not drive a vehicle, or whether she has a driver's license, or if she can read a book, or understands English. Elvira further conceded that she did not know if Appellant understands how the police and prosecutors work. Elvira had also not spoken to Appellant about courts and judges. Elvira had never spoken to Appellant about school or "about school for any of her nieces and nephews."

The State asked, on re-direct examination, if Elvira had any reason to discuss with Appellant; about panda bears, immigration issues, Obama, City Council, Elvira's checking account, or Elvira's financial affairs, or asked about Appellant's financial affairs. Elvira responded no. Elvira stated that Appellant assisted her with the *tostaditas* and helping to serve the food, and she did not hit the pinata at the party. Under re-cross examination, Elvira said she had seen Appellant more than twice, but could only recall those two times specifically.

**Barbaro Perez**

21

Barbaro is married to Elvira. He knows Appellant because she went to his house once. He saw her one other time at his son-in-law's house. He has never had a conversation with her. He had heard her speak to other individuals. He told the jury that she never appeared slow or mentally retarded to him. He saw her in the kitchen but did not see what she was doing. Appellant never appeared confused or disoriented to him, and he never noticed anything unusual about her. When Appellant came to his house, he discovered her talking with his daughter Claudia and his son-in-law. He never saw Appellant take care of his grandchildren.

### Jose Antonio Perez

Jose Antonio knows Appellant because he has seen her about four times. Jose Antonio stated Appellant is related to his brother-in-law. He has seen her at two parties at his mother's house and one party at his house. He observed her serving food and speaking with relatives. He thought she was a normal person. He opined that she may be shy. He never thought she might be slow. He had observed her take care of his sister's children. He knew Appellant was left alone with the children when they were eleven, seven, and three years old. According to Jose Antonio, Appellant took care of the children on her own in the afternoons when his sister and her husband went to school. He reported that on one occasion, Appellant offered to make tortillas at his house.

On cross-examination, Jose Antonio conceded he had only seen Appellant four times in his life. He observed her taking care of the children once after his grandfather's funeral. He had heard she made "really good tortillas, and so I asked her one day if she could make tortillas at my house so that we could taste them, and she offered and said yes." Jose Antonio testified on the day of the funeral, Appellant babysat an eleven, seven, and four-year-old for about six hours by herself.

### Exhibits

22

In addition to the testimony, the State introduced three photographs of Appellant; one with two other ladies; another with her twin grand-nieces, and the third beginning a dance at a *quincerea.* The defense introduced the two psychiatric reports from Dr. Rodriguez-Cheverez. The jury found Appellant competent to stand trial. This appeal ensued.

## ANAYLSIS

Appellant's burden was to prove by a preponderance that she was incompetent because she did not have: "(1) sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person." TEX.CODE CRIM.PROC.ANN. art. 46B.003(a). Relevant factors include whether Appellant can: (1) understand the charges against her and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify. *Morris*, 301 S.W.3d at 286. We review the evidence in a neutral light and sustain Appellant's factual sufficiency claim if the jury's finding of competency is against the great weight and preponderance of the evidence so as to be manifestly unjust, conscience-shocking, or clearly biased. *Matlock,* 392 S.W.3d at 671.

Turning to the case at hand, Appellant was found incompetent to stand trial by the Defense's examining psychiatrist, Dr. Rodriguez-Cheverez and the State's examining psychiatrist Dr. Cynthia Rivera. In addition, a psychologist, Dr. Natalcio found Appellant to have an I.Q. of 60, according to Dr. Rodriguez-Cheverez is equivalent to an eight-year-old. Dr. Rodriguez-Cheverez opined that Appellant, during his evaluation, clearly demonstrated she lacked the ability to understand the proceedings in court and to be able to participate appropriately in her defense.

23

He stated that she does not understand how a lawyer would assist her, what is a prosecutor's role, no idea or concept of the role of the jury or a witness, and could not define a judge or explain what a judge does. In his opinion, Appellant was not malingering. He testified Appellant could not consult with her attorney with any degree of rational understanding nor did she have a rational or factual understanding of the charges she was facing. Dr. Rodriguez-Cheverez stated Appellant graduated from high school but attended special education classes for the entirety of her scholastic career. Dr. Rodriguez-Cheverez diagnosed Appellant as mildly mentally retarded and would not become competent.

Dave Contreras, Appellant's former defense counsel echoed Dr. Rodriguez-Cheverez' findings and conclusions. He stated she lacked the ability to effectively consult with him or disclose pertinent, relevant facts related to the charges against her. In fact, Appellant had failed to recognize him. Contreras explained he had been an attorney for twenty-three years, seven years in which he had handled cases with severely mentally ill clients, and in his interactions with her, she failed to understand her case and could not make decisions.

Consuelo acknowledged Appellant receives social security benefits because she is disabled. Consuelo's husband is authorized by the Social Security Office to act on behalf of Appellant and controls her bank account. Appellant has never lived on her own or worked outside the home and was never paid for the work she did for any of the family members. Consuelo, with whom Appellant had been living for the last eleven months, testified Appellant could not remember her attorneys longer than a day and does not understand what is going on in court. Consuelo stated Appellant is smarter than eight-year-old and was capable of cooking, feeding, and taking care of her mother.

Ubaldo and Claudia testified that Appellant is smarter than an eight-year-old. According to them she could cook, clean, play cards, bathe children, babysit children on her own, watch TV with their kids, and make tortillas. They had no concerns about her mental abilities and never considered her being mentally retarded. If they had any concerns, both testified they would have not left their children with her. She also played numerous physical activities with the family. Ubaldo admitted his mother oversaw Appellant after his grandmother died, but Appellant had the ability to get cash with her card. He acknowledged Appellant was forty years old when her mother died, and a family member had to take possession or custody of her. Ubaldo only spoke to her about cooking, cleaning, and the kids. He maintained Appellant wanted to go live with his mother. Claudia cooked for them, spoke only Spanish, danced very well, and had her own cell phone. Both maintained Appellant had a normal marriage. According to Claudia, Appellant could manage her money, interact with adults and children, cook, dance, and is smart enough to make her own decisions.

Julio and Kathleen, Ubaldo's brother and sister, both agree that Appellant is smarter than an eight-year-old. Appellant cared for Kathleen's children, cooked, and cleaned for the family. She cooks well, and the family enjoyed her tortillas. Julio in responding to whether Appellant is mentally retarded said, "she's aware of her surroundings. That's all." He considered her slow "[a]t times" but considered her an adult because she can walk around a store unassisted and cooks, cleans without supervision. She listens to the radio, plays cards such as Go Fish and Soltaire. He said she understands conversations but would ask him to repeat himself. They would talk about cooking, cleaning, card games, and family members. He also pointed out that she went grocery shopping by herself and he saw her drive once. He had no concerns when she babysat his nieces.

25

Kathleen allowed Appellant to take care of her daughters up "[t]o a certain point." She did consider Appellant "slow." She based her opinion on the fact that Appellant "repeats the same thing over and over." Kathleen did not experience any problems in conversing with Appellant. Further, Kathleen testified that Appellant could correctly identify different colors. Appellant knew exactly what she wanted to buy at the store. Kathleen did confirm that her mother acted as Appellant's guardian in handling Appellant's SSI money. Kathleen did not believe Appellant is mentally retarded. She based her opinion on the fact Appellant can cook, clean, and hold a conversation. She acknowledged that Appellant is mentally disabled and cannot take care of her money because "she's not mentally capable of doing it herself." Kathleen was not aware of the exact nature of Appellant's mental disabilities.

Claudia's parents and brother testified that Appellant appeared normal and did not seem slow or mentally retarded. Elvira recalled two specific occasions, Barbaro only once, and Jose four times. Elvira witnessed Appellant cook, make tortillas, and help serve food at family functions. Elvira reported Appellant could play games at parties and seemed to have a normal marital relationship. Elvira had no idea if Appellant understands how courts, judges, police, or the prosecution work. Barbaro had never spoken to Appellant but had seen her once. He never saw her confused or disoriented. Jose observed Appellant serving food and speaking with family members. He had also seen her take care of his sister's children. She appeared normal to him.

The State argues these facts are like *Galvan* in that the neuropsychologist deemed Galvan incompetent, determined his I.Q. was 54 which indicated mental retardation. *Galvan v. State,* 324 S.W.3d 233, 235 (Tex.App.—Eastland 2010, pet. ref'd). The doctor acknowledged that Galvan was manipulative and attempting to appear more impaired than he was. *Id.* The doctor opined that Galvan was still borderline mentally retarded. *Id.* The doctor concluded Galvan did not have

26

a present ability to consult with his attorney with a reasonable degree of rational understanding. *Id.* He did not render an opinion as to whether Galvan understood the proceedings. *Id.* The lay witnesses collectively testified Galvan was normal, conversed normally, without difficulty and appropriately. *Id.* at 236. The Eastland Court, in upholding the jury's verdict that Galvan was competent, noted that the jury was not bound by the opinion of the neuropsychologist. *Id.* at 235-36. Further, we recognize, as the State points out, that expert witnesses may not dictate the jury's determination of competency. *Graham v. State,* 566 S.W.2d 941, 949 (Tex.Crim.App. 1978).

The State, after examining four cases that overturn a jury's verdict of competency, argues factual sufficiency can only be supported when a defendant produces substantial testimony support for the plea of incompetency and the State produces no contradicting evidence, or relies solely on cross-examination, or intentionally contrives weak evidence in support of the defendant's competency. *See Meraz v. State,* 714 S.W.2d 108 (Tex.App.—El Paso 1986), *aff'd,* 785 S.W.2d 146 (Tex.Crim.App. 1990); *Jackson v. State,* 857 S.W.2d 678 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd); *Aragon v. State,* 910 S.W.2d 635 (Tex.App.—Beaumont 1995, pet. ref'd); *Nunez v. State,* 942 S.W.2d 57 (Tex.App.—Corpus Christi 1997, no pet.). While that may be true, it belies the state of the evidence in these cases. We find the *Nunez* case instructive. Three expert witnesses, each an examining psychiatrist, found Nunez incompetent. *Nunez,* 942 S.W.2d at 59. Each testified they did not believe he was faking the behavior but acknowledged that was always a possibility. *Id.* at 59. The State did not call any other witnesses. *Id.* at 60.

The State's closing argument at trial posited that Appellant was smart and was playing dumb as evidenced by her ability to cook, clean, take care of children, dance, play cards, drive, marry, and use an ATM machine. These activities, according to the State refuted Dr. Rodriguez-Cheverez's conclusion that Appellant was retarded. The State urged the jury to find Appellant

27

competent because Appellant's family members knew her better than the examining experts and the defense failed to put on Dr. Rivera and Dr. Natalcio. In addition, Dave Contreras, her former defense attorney, was not an expert psychiatrist and therefore, lacked the ability to testify to Appellant's competency.

Here, we have two psychiatrists, who have fully and completely conducted two evaluations and found Appellant incompetent. Dr. Rodriguez-Cheverez concluded Appellant lacked both the ability to consult with her attorney with a reasonable degree of rational understanding or a rational as well as a factual understanding of the proceedings. He was certain she was not malingering. His conclusion was buttressed by her I.Q. of 60, which he explained was equivalent to an eight-year-old. Further, Appellant had completed high school only by participating in special education classes throughout her scholastic career. Appellant also received SSI as the result of her mental disabilities, ostensibly for her sub-intellectual functioning.

Mr. Contreras, an attorney well experienced with clients suffering from mental health issues and disabilities, reiterated again and again how Appellant could not assist him, failed to comprehend the charges against her, and did not even recall who he was. He concluded that she did not have a present ability to consult with him with a reasonable degree of rational understanding nor did she possess a rational and factual understanding of the proceedings against her.

While some of Appellant's family members acknowledged her "slowness" and mental disabilities, however all opined she was smarter than an eight-year-old and appeared normal. That testimony wholly failed to refute or address the *Morris* factors of whether Appellant (1) understands the charges against her and the potential consequences of the pending criminal proceedings; (2) is able to disclose to counsel pertinent facts, events, and states of mind; (3) engage

28

in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify. *See Morris*, 301 S.W.3d at 286. The State's witnesses' testimony supported Dr. Rodriguez-Cheverez diagnosis of mild mental retardation but did not overcome the testimony relevant to Article 46B.003(a) of the Code of Criminal Procedure.

Accordingly, we hold that the jury's verdict that Appellant was competent to stand trial was so against the great weight and preponderance of the evidence as to be manifestly unjust and sustain Appellant's point of error.

## **CONCLUSION**

We reverse the judgment of the trial court and remand for a new competency hearing and a new trial.

March 29, 2019

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J., Not Participating

(Publish)